UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:22-cv-21719-DPG

DANIEL AMY,

    Plaintiff,

vs.

THE FLORIDA INTERNATIONAL
UNIVERSITY BOARD OF TRUSTEES,

    Defendant.
_____/

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

    The Plaintiff, Daniel Amy, by his undersigned attorney, makes the following Statement of Material Facts pursuant to Local Rule 56.1(a)(2). The first 78 statements of fact respond to the Statement filed by Defendant (ECF No. 54). The remaining statements (79 to 105) assert additional material facts.

    1.    Undisputed but incomplete. See fact 82 below.

    2.    Disputed in part (second sentence).[1] The claim that FIU is "committed to assisting students with disabilities" is untrue, given its failure to accommodate Amy's disability during the 2018-19 academic year. See facts 86 and 87 below.

    3.    Disputed in part (second sentence). Loynaz told Amy in 2018 that he could not approve two of Amy's requested accommodations (a reduced course load and production of lecture notes). Loynaz told Amy he would need to ask his professors to provide those accommodations. (Amy dec. ¶ 22[2]; ECF No. 53-1 at 76: 5-23) Undisputed as to the first sentence, although the description of Loynaz's authority is incomplete. Loynaz was the Associate Director of FIU's Disability Resource Center until he became DRC's Access Consultant Manager. His title changed but his job did not. (ECF No. 53-9 at 11:2-

---

[1] Objection to the second and third sentences because FIU's duty to implement accommodations involves a question of law, not of fact.
[2] "Amy dec." refers to the Declaration of Daniel Amy dated November 17, 2023 filed with this response as Exhibit 1.

1

14, 13:4-9) His job is to determine accommodations for disabled students. (Id. at 15: 9-12). Loynaz works with faculty to implement accommodations and advises faculty about necessary accommodations. (Id. at 16: 1-12) He has discretion to make accommodation decisions on his own. (Id. at 16: 16-24)

4. Undisputed.

5. Disputed in part (first sentence). Exceptions were made to the four-year curriculum path. (Amy dec. ¶ 6) In the 2020-21 academic year, Amy was granted an exception to the four-year curriculum path. (Amy dec. ¶¶ 6, 58-59)

6. Disputed. Exceptions were made to the timing of the curriculum path that Hamid described. (Amy dec. ¶ 6)

7. Undisputed.

8. Undisputed.

9. Disputed in part (second sentence). Although FIU could have assigned teaching duties to Amy, it did not do so. He was assigned to assist a professor with the professor's research, primarily by performing data entry. (Amy dec. ¶ 9)

10. Disputed in part (second sentence). Amy could have been asked to teach but he was not assigned teaching duties in the 2018-19 academic year. (Amy dec. ¶ 9)

11. Undisputed for the purpose of this motion.

12. Undisputed.

13. Disputed. Amy lost his graduate assistantship at the end of the 2018-19 academic year. (Amy dec. ¶¶ 10, 57) FIU nevertheless claims that it offered to reinstate his graduate assistantship in 2021. (ECF No. 54 at ¶ 64)

14. Undisputed.

15. Undisputed.

16. Disputed. Since Amy was required to maintain his status as a graduate student in order to maintain his employment as a graduate assistant, the accommodations he requested were directly related to his ability to maintain his employment. (Amy dec. ¶¶ 10, 57)

17. Undisputed that the email author made the cited statements.[3]

---

[3] Objection to the email as inadmissible hearsay.

18. Disputed that graduate assistants do not receive fringe benefits, as FIU admits that they receive group health insurance.[4] (ECF No. 54 at ¶ 11)

19. Disputed in part. The program is not always a "four year program." Students have taken more than four years to complete the program. (Amy dec. ¶ 6)

20. Undisputed.

21. Undisputed.

22. Undisputed, assuming that "registered" accommodations refers to accommodations that DRC requires FIU to provide.

23. Disputed as incomplete and misleading. Amy treated with Dr. Kato in August 2018 before he started his fall semester classes. He did not speak to Dr. Kato about disability accommodations because he did not yet know what disability-related barriers FIU would erect to his opportunity to participate in the program. (Amy dec. ¶ 2)

24. Disputed. Loynaz's recollection is incomplete. Loynaz does not recall if there was a learning disability on Amy's file or not. (ECF No. 53-9 at 26:9-11) Regardless of what Loynaz claims to recall, at the initial meeting Amy explained his learning disability. (Amy dec. ¶ 14) Loynaz discussed standard accommodations that FIU was prepared to offer for a learning disability and offered accommodations from that list. (Id. at ¶ 17) Amy did not know at that point that other accommodations could be granted. After researching the issue, Amy requested two additional accommodations from Loynaz in the fall semester of 2018: a reduced course load and copies of the professors' written lecture notes. (Id. at ¶ 19) Loynaz told Amy that he was not authorized to approve those accommodations and told him he would need to request them directly from the department or his professors. (Id. at ¶ 22)

25. Disputed. Loynaz does not claim to have personal knowledge of whether professors in the finance department have written lecture notes. Amy saw his professors lecturing from written notes. (ECF No. 53-1 at 63:24 to 64: 2; Amy dec. ¶ 27) Jiang kept his lecture notes in a Word file. (ECF No. 54 at ¶ 47) In late August 2019, DRC finally accommodated Amy by directing professors to provide their lecture notes to him. (Amy dec. ¶ 58) His professors did so in the spring semester 2021, when Amy repeated classes that he had taken in the spring of 2019 before the accommodation was granted. (ECF No. 54 at ¶

---

[4] Objection that the form (ECF No. 54-25) is not authenticated, is not signed by Amy, and is not relevant because it does not mention Amy.

68; Amy dec. ¶ 59) Their ability to provide the notes when they were told to do so supports the inference that they had lecture notes in 2019 and were capable of producing them.

26. Disputed. Loynaz offered to ask one of Amy's classmates to share the classmate's notes with Amy. Amy did not want his classmates to know that he was disabled. Amy suggested to Loynaz that FIU could accommodate his disability by providing an outside notetaker to take notes for him during lectures, but Loynaz refused that request. (Amy dec. ¶ 21)

27. Disputed. Whether or not digital recording might be useful to other students, it would not accommodate Amy's disability because it is just as difficult to process language in a recording as it is to process the lecture in the classroom. (Amy dec. ¶¶ 3, 18)

28. Disputed. The software that Amy received did not take notes and did not convert spoken language into written text. (Amy dec. ¶ 20) See facts 32 and 42 below. Its usefulness to Amy was also limited because the professors were lecturing while writing formulae on a whiteboard and the software was unable to capture the whiteboard equations or to link them with the content of the lecture. (Amy decl. ¶ 20)

29. Disputed. The software only made audio recordings. It did not help Amy process verbal communication. See responses 27 and 28 above and 32 below.

30. Disputed in part. DRC did not list all necessary accommodations because it did not grant Amy a reduced course load or copies of lecture notes. (Amy dec. ¶¶ 22, 23, 25, 27, 33, 50)

31. Undisputed.

32. Disputed in part. DRC gave Amy permission to use a digital recorder but did not provide him with one. (Amy dec. ¶ 18) The Sonocent software did not take or prepare notes. (Amy dec. ¶ 20) Its primary function was to make audio recordings of lectures. (ECF No. 53-1 at 55: 16-20; ECF No. 53-9 at 24:23 to 25:2) The user can designate starting and ending points of the audio and color code them. (Id. at 25:4-7) This allows the user to have someone transcribe marked portions of the recording, just like a court reporter will transcribe parts of a deposition. (Id. at 25:17-21) See fact 42 below.

33. Disputed as an incomplete and misleading characterization of Amy's testimony. Amy testified that he received "partial" lecture notes in the fall semester 2018. (ECF No. 53-1 at 61:23-24) Specifically, he received lecture notes from Prof. Oztekin, who taught Financial Theory I, but not from his other professors. (Amy dec. ¶ 11)

34. Undisputed.

35. Disputed. Amy did not ask Dr. G. for his lecture notes directly, but he asked Lawrence, as director of the program, to help him obtain Dr. G.'s lecture notes. The notes were not provided. (Amy dec. ¶ 23) The "supplemental materials" provided by Dr. G. consisted of two or three short handouts that did not serve as a substitute for lecture notes. (Id. at ¶ 27)

36. Disputed. Amy did not ask Kang for his lecture notes directly, but he asked Lawrence, as director of the program, to help him obtain Kang's lecture notes, but the notes were not provided. (Amy dec. ¶ 23) The "supplemental materials" consisted of solutions to assignments. (Id. at ¶ 27)

37. Undisputed.

38. Undisputed.

39. Disputed in part. DRC notified Amy's spring semester professors of the accommodations it approved, but it did not list all "necessary" accommodations because a reduced course load and copies of lecture notes were necessary to give Amy an equal opportunity to benefit from the program. (Amy dec. ¶¶ 22, 33) Loynaz does not recall asking Amy for any additional medical documentation to justify his requested accommodations. (ECF No. 53-9 at 27:25 to 28:10) Loynaz did not do so. (Amy dec. ¶ 15)

40. Disputed in part. The letter in question only provided a list of accommodations that DRC approved, not all the accommodations that Amy needed. (ECF No. 53-10 at 10) See response to fact 39 above.

41. Disputed in part. Some professors gave Amy some additional time to turn in assignments. However, Professors Lawrence and Jiang penalized Amy for submitting late assignments. (Amy dec. ¶ 29)

42. Disputed in part. The software was helpful because it was better than nothing, but Amy had received lecture notes in the master's program and concluded that the software was not an adequate substitute for having lecture notes. It was much more efficient for Amy to review written notes than to listen to a recording over and over as he tried to process the lecture and reduce it to written notes. (Amy dec. ¶ 20)

43. Disputed as incomplete and misleading. Amy received poor grades in the spring semester because he did not receive the disability accommodations he requested.

(Amy dec. ¶ 32) See fact 86 below. When he was provided with those accommodations in 2020-21, he received much better grades. (Amy dec. at ¶ 59)

44. Disputed in part (final sentence). FIU took no action to indicate that Amy was not meeting the requirements of the assistantship to its satisfaction. At no point did FIU discipline Amy or advise him that he was in danger of losing his assistantship because of his work performance. FIU did not tell Amy that his employment was being terminated because of unacceptable work performance. (Amy dec. ¶ 10)

45. Disputed as incomplete and misleading. While Amy was provided certain accommodations that DRC approved, he was not provided with the primary accommodations that he needed: a reduced course load and copies of lecture notes. See response to fact 43 above and 86 below.

46. Disputed. Amy did not ask Duarte for his lecture notes directly, but he asked Lawrence, as director of the program, to help him obtain Dr. G.'s lecture notes. The notes were not provided. (Amy dec. ¶ 23)

47. Disputed in part. It is correct that Jiang had his lecture notes in a Word file and that he denied Amy's request because the request came from Amy and was not mandated by DRC. The only explanation Jiang gave to Amy was that there were typos in the notes. He did not tell Amy that he was denying Amy's request for any other reason. (Amy dec. ¶ 25) Regardless of alleged typos, he gave his notes to another student about a week before the final exam. (Id.) When Jiang answered the IDEA investigator's questions about his failure to provide lecture notes, he did not claim that he refused to do so because it would "alter his training." (ECF No. 53-12 at 16) Allowing Amy to take pictures of the Word document projected on the screen was not an effective accommodation because Jiang scrolled the document as he lectured and it was impossible to take usable pictures in class. (Amy dec. ¶ 25)

48. Disputed in part. Jiang gave his notes to another student about a week before the final exam. Amy received the notes from that student. Because he only had the notes at the end of the semester, he did not have them in time to help him complete his assignments. (Amy dec. ¶ 25)

49. Disputed. Amy received an F because he was could not perform satisfactorily without receiving the accommodations he requested. (Amy dec. ¶ 26)

50. Disputed in part (second and third sentences).[5] The only explanation Lawrence gave Amy for denying his request for lecture notes is that it would be unfair to the other students. He did not explain why it would be unfair. (Amy dec. ¶ 35) When questioned by IDEA, Lawrence stated: "The DRC has never asked me to provide any notes. If they do so, then I would expect the University would provide the resource to make this accommodation successful." (ECF No. 53-12 at 19) Lawrence did not identify any "resources" he would need to email notes to students. In fact, despite Lawrence's vague claim that sharing his lecture notes has something to do with teaching doctoral students to create new knowledge, Lawrence shared his notes with students when Amy took the same class in the 2020-21 academic year, after DRC told Lawrence to do so. (Amy dec. ¶ 36)

51. Disputed in part (fourth sentence). While Amy reminded Lawrence of his disability, Amy had advised Lawerence of the nature of his disability and had asked him for accommodations before his classes began. (Amy dec. ¶ 23)

52. Disputed as misleading and incomplete. Amy was late turning in assignments because FIU had not accommodated his disability. (Amy dec. ¶ 28) See fact 53 below.

53. Disputed. Amy was not able to complete the midterm exam because, in the absence of the accommodations he requested, his classwork was overwhelming and he had fallen behind. Lawrence also failed to give Amy the correct solutions to assignments despite giving them to nondisabled students to help them study for the exam. Amy became despondent when he realized that he could not solve the test problems and so he did not try to complete the exam. (Amy dec. ¶ 42) All students were given a chance to take the makeup exam. This was not an accommodation of Amy's disability. Amy took the makeup exam after having a chance to study over the spring break. He scored 21 of 22 points on the makeup exam and would have earned a score of 95%, but Lawrence penalized him for failing to complete the first midterm and gave him a score of 59%. (Amy dec. ¶ 43)

54. Disputed.[6] Notwithstanding Lawrence's alleged denials, Lawrence made disparaging remarks that revealed his discriminatory animus toward students with learning disabilities who wish to pursue the doctoral program that he directs. See facts 97-102 below.

---

[5] Objection to the admissibility of Lawrence's hearsay statement.
[6] Objection to the admissibility of Lawrence's hearsay statements.

55. Disputed as misleading and incomplete. Amy registered for independent study in the summer semester but could not take the course because Lawrence did not meet with him to determine a supervised research project that Amy should pursue. Lawrence met with non-disabled students in the course but not with Amy. (Amy dec. ¶ 46)

56. Disputed. Lawrence initially gave Amy an incomplete in the course. Lawrence told him that the incomplete would soon be changed to an F. The incomplete effectively terminated his enrollment. After Amy was permitted to restart the program in the 2020-21 academic year, he completed the independent study course under the supervision of a different professor and earned an A-. (Amy dec. ¶ 46)

57. Disputed in part (final sentence). Amy's email states that he had requested a medical report, not that he would provide one. (ECF No. 53-22 at 3)

58. Undisputed but incomplete and misleading. See fact 87 below.

59. Undisputed.

60. Undisputed.

61. Disputed as incomplete and misleading. Amy was not allowed to register in Fall 2019 because of poor grades that were caused by FIU's failure to accommodate his disability. (Amy dec. ¶¶ 32, 33, 47)

62. Disputed[7] as to the claim that FIU "allowed" Amy to return to the program. FIU had not accommodated Amy's disabilities, causing him to earn poor grades in the spring semester of the 2018-19 academic year. (Amy dec. ¶ 32) FIU did not accommodate Amy with a reduced course load until August 20, 2019, after the 2018-19 academic year ended. (ECF No. 54 at ¶ 60) At that point, it was too late for Amy to benefit from the accommodation. (Amy dec. ¶ 58) It is reasonable to infer that FIU agreed to return Amy to the program to fulfill its legal requirement, albeit belatedly, to accommodate his disability.

63. Undisputed.[8]

64. Disputed.[9] The supporting exhibit is Hamid's email, in which he tells Amy what his "main goal" will be. The email does not claim Amy advised Hamid that it was Amy's main goal. (ECF No. 53-23 at 2) In addition, the claim that FIU offered to reinstate the assistantship contradicts its earlier claim that students who lose their graduate

---

[7] Objection to the word "importantly" because it is an opinion, not a fact.
[8] Objection to relevance.
[9] Objection to relevance.

assistantship for any reason are not eligible to hold another graduate assistant position. (ECF No. 54 at ¶ 13)

65. Undisputed.[10]

66. Undisputed.[11]

67. Undisputed.[12]

68. Undisputed.[13]

69. Disputed as incomplete and misleading.[14] Amy was earning an A in Lawrence's class until Lawrence suddenly and without explanation used a "bonus point" system to grade Amy's final exam. The change in grading methodology reduced Amy's grade from an A to a B. (Amy dec. ¶ 60)

70. Disputed as incomplete and misleading.[15] Amy believed he was continuing to experience retaliation and that the retaliation would continue if he remained in the program. He discussed his concerns with Loynaz but received no protection from retaliation. He decided that continuing to pursue the doctoral program at FIU would be damaging to his mental health, so he elected not to take the qualifying exam. (Amy dec. ¶ 61)

71. Undisputed.[16]

72. Undisputed.[17]

73. Disputed in part (final sentence). See fact 102 below. FIU's Academic Grievance Committee agreed that Lawrence held Amy "to a different standard" than the nondisabled student and that "the grade [Amy] earned in FIN 7809 was not solely based upon Mr. Amy's performance in the class including, but not limited to, Homework 4 and 5." (ECF No. 53-19 at 3-4) The Committee determined that, by departing from standards, Lawrence acted capriciously and arbitrarily in giving Amy a lower grade than he gave to the other student. (ECF No. 53-19 at 3-4) See also ECF No. 54 at ¶ 75 (Amy "was held to a different standard than his peers"). A reasonable inference to draw from the facts described

---

[10] Objection to relevance.
[11] Objection to relevance.
[12] Objection to relevance.
[13] Objection to relevance.
[14] Objection to relevance.
[15] Objection to relevance.
[16] Objection to relevance.
[17] Objection to relevance.

in 102 below and from the Committee's rejection of Lawrence's explanation of his disparate treatment is that the explanation is pretextual.

74. Undisputed.

75. Undisputed.

76. Disputed as to the accuracy of FIU's self-serving findings.[18] A jury can reasonably find from the evidence described in this submission inter alia (most of which IDEA does not address) that FIU discriminated against Amy. See Defendant's Memorandum in Opposition to Summary Judgment sections II and V.

77. Disputed as to the accuracy of the appeal findings.[19] The facts as summarized in Amy's declaration and the evidence discussed inter alia in this response will permit a jury to find that Amy was the victim of retaliation and discrimination, including a failure to accommodate, regardless of the self-serving appeal findings. See Defendant's Memorandum in Opposition to Summary Judgment section III.

78. Undisputed as to the content of the EEOC charge.[20]

Additional Facts

79. Amy was admitted to the doctoral program in FIU's Department of Finance. (Amy dec. ¶ 5) When the FIU Department of Finance recommended Amy's acceptance to the FIU Graduate School, the director of the Doctoral Programs for the College of Business advised Amy that "only a select few were chosen from a set of highly qualified applicants for admission into this program." (ECF No. 53: 2)

80. In conjunction with granting his admission to the doctoral program, FIU employed Amy as a graduate assistant. It paid him approximately $25,000 and gave him other employment benefits, including the opportunity to purchase group health insurance. Amy depended on the income he earned from FIU for his financial support during the 2018-19 academic year. (Amy dec. ¶ 7)

81. FIU enters into employment agreements with graduate assistants. (Amy dec. ¶ 8) As a condition of employment, a graduate assistant is not allowed to be employed outside of FIU. (Id. exh. 1)

---

[18] Objection that the investigation findings are based on inadmissible hearsay and are more prejudicial than probative.
[19] Objection on the grounds stated in the objection to fact 76.
[20] Objection to relevance.

82. Amy has a learning disability that impairs his ability to process spoken language and translate it into writing with the same ease as most people. The disability makes it difficult for Amy to take notes and to write answers to questions based on information delivered in a lecture. Because it takes Amy a considerable time to convert spoken language into written notes that he can study, he needs to limit his student course load so that he is not overwhelmed by the task of processing spoken information. He can process lectures effectively if he has the professor's lecture notes during the lecture so that he can read the essential content of the lecture as the professor is speaking it. (Amy dec. ¶ 3: ECF No. 53-1 at 67:6-10)

83. In the fall semester of 2018 and throughout the spring semester of 2019, Amy requested specific accommodations of his disability: a reduced course load and being provided with his professors' lecture notes so he could use those notes to help him follow lectures as they were delivered. (Amy dec. ¶¶ 18-19, 27)

84. Amy initially made those accommodation requests to Stephen Loynaz. (Amy dec. ¶ 19)

85. Loynaz did not ask Amy for any documentation from a medical provider that supported or recommended specific accommodations. Because Amy was dissatisfied with FIU's failure to provide him with the accommodation that he needed, Amy asked the treatment provider he was seeing in 2019 to provide such documentation. Dr. Johnson specifically recommended that he receive accommodations that included a reduced course load and written lecture notes. If Loynaz had asked Amy for medical documentation supporting those requested accommodations, he would have provided it to him at an earlier time. (Amy dec. ¶ 15)

86. During the 2018-19 academic year, FIU did not provide the accommodations that Amy requested: a reduced course load and being provided with professors' lecture notes. (Amy dec. ¶¶ 22, 23, 27, 30, 32, 33, 35, 39, 50) Those accommodations were necessary and would have been effective means of allowing Amy to participate equally with nondisabled students in the doctoral program. (Id. at ¶ 33)

87. The accommodations that FIU provided were not effective in overcoming the barriers to participating in the doctoral program that his learning disability imposed. (Amy dec. ¶¶ 20, 26-27, 32, 50, 52) FIU was on notice that the accommodations it provided were not effective but did nothing to evaluate the effectiveness of those accommodations. (Amy

dec. ¶¶ 37, 48, 53) Amy fell behind and received poor grades in 2018-19 because FIU failed to provide effective accommodations for his learning disability. (Amy dec. ¶¶ 28, 32-33) Lawrence and Hamid told Amy that his poor grades prevented him from continuing in the program regardless of his performance on the qualifying exam at the end of the semester so he did not take it. (Amy dec. ¶ 47)

88. Lawrence and Hamid both told Amy that they would not provide his requested accommodations unless they were directed to do so by DRC. Since DRC told him that only the department and his professors could approve the requested accommodations, Amy was caught in the middle of bureaucratic in-fighting that resulted in neither DRC nor the department (including his professors) granting his requested accommodations for the 2018-19 academic year. (Amy dec. ¶¶ 30, 51, 55)

89. Amy discovered in August 2019 that he was no longer enrolled as a graduate student. His credentials to log into FIU databases and to use FIU facilities had been revoked because FIU determined that he was no longer enrolled in the doctoral program. Since FIU effectively terminated his participation in the program, he could no longer work or be paid as a graduate assistant. (Amy dec. ¶ 57)

90. Amy restarted the program in 2020-21. He was only required to take two classes for grades. He audited the remaining courses and kept the grades for those classes that he earned in 2018-19. He repeated two courses for grades that he had taken in 2019. He expected that the new grades he earned would be substituted for the grades he earned in 2019 when his disability was not being accommodated. (Amy dec. ¶ 59)

91. In 2020-21, Amy earned a B in both of his graded courses because the professors gave him lecture notes and because, having to take only two courses for grades, his course load was reduced. If the B grades he earned in 2020-21 are substituted for the grades he received in 2018-19, his cumulative GPA is above 3.0, making him eligible to continue in the program. (Amy dec. ¶ 59)

92. Notwithstanding that his poor grades in 2019 resulted from a failure to accommodate his disability (see facts 43, 61, and 87 above), FIU is reporting his cumulative GPA as less than 3.0 because it is including his Spring 2019 grades. (ECF No. 53-16 at ¶¶ 8-13, 24)

93. When Amy restarted the doctoral program courses in the 2020-21 academic year, DRC mandated the accommodations he had requested in 2018-19. (Amy dec. ¶ 33)

The accommodations were effective in allowing Amy to overcome his disability and to succeed in his classes by earning grades that would have allowed him to continue in the program. (Amy dec. ¶¶ 26, 57, 59)

94.     Amy was earning an A in a class he took from Lawrence in 2021 but Lawrence made an unexplained change in his grading methodology that reduced Amy's grade to a B. (Amy dec. ¶ 60) Because Amy viewed that action and others as retaliatory and because he received no protection from retaliation despite asking Loynaz for protection, he decided it would be better for his mental health if he stopped pursuing the doctoral program. He therefore elected not to take the qualifying exam at the end of the semester despite having achieved a grade point average that should have allowed him to continue in the program. (Amy dec. ¶¶ 59, 61)

95.     When Amy asked Loynaz for accommodations of his disability, he did not ask FIU to change its academic standards. He wanted to be judged on the quality of his work, using the same standards that applied to every other student. (Amy dec. ¶ 16)

96.     On several occasions during the spring 2019 semester, Amy politely advised Loynaz and Lawrence (and later Professor Hamid) that he objected to their failure to provide effective accommodations of his disability. His objections produced no results until after all his 2018-19 course work had ended. (Amy dec. ¶ 31)

97.     During a meeting on January 11, 2019, Lawrence responded to Amy's requests for accommodation by telling Amy that if his disability was going to pose a problem for him keeping up with the program, he might have to make a difficult decision on whether this degree and career path were right for him. Lawrence did not acknowledge that the doctoral program had any obligation to provide effective accommodations for Amy's disability. (Amy dec. ¶ 24)

98.     Lawrence was aware that if Amy's disability was not accommodated, Amy would not be able to process his spoken lectures, or to prepare written solutions to problems quickly. On January 30, 2019, less than a month after Amy first explained the nature of his disability and requested accommodations from him, Lawrence humiliated Amy in his class. He asked students to write down solutions to problems during the class. He repeatedly looked over Amy's shoulder and berated him, in front of his classmates, for failing to write down answers to problems that his disability prevented Amy from solving quickly. (Amy dec. ¶ 34)

99. During a meeting on March 8, 2019, Amy explained that because his disability had not been accommodated effectively, he was behind in every class. Lawrence then informed Amy that he and Jiang had discussed Amy's performance and they both agreed that Jiang should fail him because they had "an obligation to protect the profession." The context of the conversation made clear that Lawrence was speaking of the academic profession. (Amy dec. ¶ 37) In a later meeting, Lawrence suggested to Amy that he might want to pursue a less rigorous degree rather than the Ph.D. required for an academic career. (Id. at ¶ 49) Rather than accommodating Amy's disability so Amy could pursue an academic career, Lawrence thought he should stop pursuing one. (Id. at ¶ 37)

100. During the March 8, 2019 meeting, Lawrence mentioned that Amy never disclosed his disability on his application for the doctoral program. Lawrence also told Amy that "knowing what I know now, I would not admit a student with a disability in the future because the program is too rigorous." (Amy dec. ¶ 38)

101. When Amy explained to Lawrence on March 8, 2019 that his struggles in the program were caused by the failure provide him with instructors' notes and to reduce his course load, Lawrence insisted that that the doctoral program was strictly a 4-year cohort program and that Amy had to keep pace with his classmates. He told Amy that no adjustments to the program structure could be made and no accommodations would be provided only to Amy because that would be unfair to his classmates. He did not explain why it is unfair to give accommodations to disabled students who need them but not to nondisabled students who don't need them. (Amy dec. ¶ 39)

102. A few days after Amy's March 8, 2019 meeting with Lawrence, Amy worked together with a nondisabled student on two homework assignments in Lawrence's class. Lawrence encouraged students to work together and he was aware that the nondisabled student was tutoring Amy. The assignments required students to replicate mathematical proofs. Because there is little to no variation in their possible solutions, all correct solutions will be similar to each other. Lawrence decided that the nondisabled student and Amy were both guilty of plagiarism for working together to arrive at the same solution, yet he gave Amy a lower grade than he gave the nondisabled student as punishment for committing the same offense of plagiarism. The punishment had a negative impact on the grade Amy received for the course. (Amy dec. ¶ 44)

103. Amy complained to Loynaz about the above-described comments that Lawrence made to Amy in January and March 2019 shortly after he made them. He reported the comments to Loynaz because he viewed them as discriminatory. Although Amy put DRC on notice of Lawrence's discriminatory attitude toward students with learning disabilities, DRC took no action to protect him from discrimination in the spring semester of 2019. (Amy dec. ¶ 41)

104. Prior to his midterm exam in the spring semester of 2019, Lawrence provided the correct solutions to homework assignments to the other students in his class so that they could use them to prepare for the midterm exam. Although Amy submitted his homework assignments before the midterm exam, Lawrence did not provide him with the solutions to those assignments. (Amy dec. ¶ 42)

105. Amy's work as a graduate assistant was directed by the professor to whom he was assigned. His job duties were to complete the data entry tasks that the professor assigned to him. The professor trained him to perform those duties. He performed them in office space provided by FIU. FIU made certain office equipment available for his use as a graduate assistant. The assigned duties furthered the professor's academic research but did not advance Amy's own graduate studies or earn credit earn credit toward the completion of his Ph.D. (Amy dec. ¶ 9)

Dated: November 17, 2023
Plantation, Florida

                                              Respectfully submitted,

                                              */s/ Robert S. Norell*
                                              Robert S. Norell, Esq.
                                              Fla. Bar No. 996777
                                              E-Mail: rob@floridawagelaw.com
                                              **ROBERT S. NORELL, P.A.**
                                              300 N.W. 70th Avenue
                                              Suite 305
                                              Plantation, FL 33317
                                              Telephone: (954) 617-6017
                                              *Counsel for Plaintiff*