UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:22-cv-21719-DPG

DANIEL AMY,

    Plaintiff,

vs.

THE FLORIDA INTERNATIONAL
UNIVERSITY BOARD OF TRUSTEES,

    Defendant.
_____/

## DECLARATION OF DANIEL AMY IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.    I am the plaintiff in the above-captioned action. This declaration is based on my personal knowledge. In this declaration, I do not attempt to state every fact that I know about this case. Rather, I make this declaration in response to defendant FIU's summary judgment motion. My purpose is to provide accurate and organized information that explains the factual basis for my opposition to summary judgment and that corrects, clarifies, or supplements factual representations that FIU has placed before the court.

2.    I am disabled. One aspect of my disability has been diagnosed as ADHD. I was treated by Dr. Kato on or about August 1, 2018 for my ADHD, but I saw Dr. Kato before I began taking classes in the doctoral program at FIU. I did not speak to Dr. Kato about disability accommodations because I did not yet know what disability-related barriers FIU would erect to my opportunity to participate in the program.

3.    In addition to suffering from ADHD (or as a related part of that disorder), I have a learning disability. I was aware of that disability prior to starting the FIU doctoral program because of my experience living with it and because I discussed it with healthcare professionals who evaluated or treated me. My learning disability impairs my ability to process spoken language and to translate it into written language with the same ease and at the same speed as most other people. The disability makes it very difficult for me to take notes contemporaneously with a lecture and to write answers to questions immediately after

listening to the lecture. Because it takes me a considerable time to convert spoken language into written language that I can study, I need to limit my student course load so that I am not overwhelmed by the task of processing spoken information. I can process lectures effectively if I have the professor's lecture notes during the lecture so that I can read the essential content of the lecture as the professor is speaking it. This allows me to process the written words rather than relying solely on spoken language.

4. I earned two master's degrees from FIU, including a master's in finance. I was able to succeed in those programs without asking for accommodations of my disability because the most important accommodations that I needed were built into the programs. The professors provided their lecture notes to students and the programs did not require me to take more than two classes in a semester. In the master's programs, I earned straight A's and earned a "Best Student" award.

5. I applied for and was granted admission to the doctoral program in FIU's Department of Finance. I began the program in the 2018-19 academic year.

6. While students typically complete the classroom component of the doctoral program within four years, professors admitted to me that exceptions have been made to extend the curriculum path beyond four years on multiple occasions. I am personally aware that students have taken more than four years to complete the classwork component of the program. In fact, after the 2018-19 academic year, when FIU finally agreed to give me the reduced course load that I requested, it acknowledged that I could take more than four years to complete the course work.

7. In conjunction with granting my admission to the doctoral program, FIU employed me as a graduate assistant. It paid me a stipend of approximately $25,000 and gave me other employment benefits, including the opportunity to purchase group health insurance. I depended on that stipend for my financial support during the 2018-19 academic year.

8. FIU enters into employment agreements with graduate assistants. An example of FIU's employment agreement is attached as Exhibit 1. As a condition of employment, a graduate assistant is not allowed to be employed outside of FIU.

9. My work as a graduate assistant was determined and directed by the professor to whom I was assigned. Although I could have been asked to teach, I was not assigned to

teaching duties in the 2018-19 academic year. My primary job duties were to complete the data entry tasks that the professor assigned to me. The professor trained me to perform those duties. I performed them in office space provided by FIU. FIU made certain office equipment available for my use as a graduate assistant. The assigned duties furthered the professor's academic research but did not advance my own graduate studies or earn credit toward the completion of my Ph.D.

10. At no time was I disciplined for poor work performance as a graduate assistant. At no time did the department advise me that I was in danger of losing my assistantship because of my work performance. At no time was I told that my position as a graduate assistant was being terminated for poor job performance. Rather, I lost my position as a graduate assistant because the failure of FIU to accommodate my disability made it impossible for me to continue as a graduate student. Remaining in the doctoral program was a condition of my employment. If FIU had accommodated my disability, I would have been able to continue in the doctoral program and thus would have retained my employment as a graduate assistant.

11. During the fall semester 2018, I asked my professors for copies of their lecture notes to help me cope with my disability. Professor Oztekin, who taught Financial Theory I, provided me with her notes but the other professors did not.

12. I earned satisfactory grades during the fall semester in 2018 but I realized that I was struggling. The material was not too difficult for me but the course load (three classes in each of the first two semesters) involved a large volume of information that was imparted in lectures. That volume of information made it difficult for me to process the lectures and to prepare notes so that I could study and learn the material. Not coincidentally, I received my best grade in Prof. Oztekin's class because I was able to read her lecture notes as she lectured and thus readily processed the information she was teaching.

13. Because I was struggling, I decided that I should seek accommodations for my disability. I was unfamiliar with the process, but I became aware that the Disability Resource Center (DRC) was responsible for granting disability accommodations at FIU.

14. I met with Stephen Loynaz at DRC in or about November 2018. I provided him with a medical report documenting my ADHD. I explained the nature of my learning disability to him. He did not question that I had a learning disability.

15. Loynaz did not ask me for any documentation from a medical provider that recommended specific accommodations. Because I was dissatisfied with FIU's failure to provide me with the accommodation that I needed, I asked the treatment provider I was seeing in 2019 to provide such documentation. Dr. Johnson specifically recommended that I receive accommodations that included a reduced course load and written lecture notes. If Loynaz had asked me for medical documentation supporting those requested accommodations, I would have provided it to him at an earlier time.

16. When I asked Loynaz for accommodations of my disability, I did not ask FIU to change its academic standards. I wanted to be judged on the quality of my work, using the same standards that applied to every other student. I simply asked for accommodations that would give me the same opportunity to participate in the program successfully that nondisabled students have.

17. Loynaz told me that there were standard accommodations that FIU was prepared to offer for my disability and that he could offer me accommodations from that list. (The list appears at doc. 53-10 on pages 11 to 13.) He authorized me to take extra time to complete exams and to take the exams in a minimal distraction room, both of which are on the list.

18. Loynaz also authorized me to use a digital recorder to record lectures, although FIU did not provide a recorder. Recording a lecture is only marginally useful because it is just as difficult for me to process recorded language as it is to process the language during a lecture. The only advantage is that I can replay the recorded lecture over and over as I struggle to translate the spoken language into written notes that I can use for studying. A recording is not a substitute for the professor's notes, which I can use both to follow the professor's lecture more clearly as it is delivered and to study for exams without spending hours trying to prepare notes from recorded lectures.

19. During that first meeting, I did not know what other accommodations might be available. I did some research and learned that a reduced course load is generally regarded as a reasonable way to accommodate a learning disability. I met with Loynaz again shortly after our first meeting and asked to be accommodated with a reduced course load. I also asked to be provided with my professors' lecture notes as that had been very helpful to me as a master's student.

20. At some point, Loynaz authorized me to be licensed to use Sonocent software to record lectures. The software was better than having nothing. It was useful in helping me make audio recordings of lectures, but the software did not take notes or convert recorded language into written text. Nor did the software improve my ability to process verbal communication. It is much more efficient for me to review written notes than to listen to a recording over and over as I try to process the lecture and reduce it to written notes. In addition, the professors were lecturing while writing formulae on a whiteboard and the software was unable to capture the whiteboard equations or to link them with the content of the lecture. Sonocent was therefore not an adequate substitute for a human notetaker or having a copy of the professor's lecture notes.

21. I spoke to Loynaz about being accommodated with a human notetaker, but he would not authorize that accommodation. He said he could ask one of my classmates to share notes but I did not want to reveal to my classmates that I have a learning disability so I declined that offer. When I took classes at MDC in 2019-20, I was provided a dedicated notetaker which yielded excellent results while protecting my medical privacy. Since Loynaz would not authorize a human notetaker, I explained that obtaining lecture notes would be an effective and easy alternative.

22. Loynaz told me that he could not authorize a reduced course load or require professors to share their lecture notes because they did not appear on his list of standard accommodations. He advised me that my requested accommodations were possible, but I would need to ask the professors to give me their notes and ask the department to reduce my course load. Loynaz made it clear that only the professors and the department, not DRC, could authorize those accommodations.

23. I spoke to Professor Lawrence on January 11, 2019, before the spring classes started. I spoke to him because he was teaching one of my spring semester classes and because he was the Academic Director of the Doctoral Program for Finance. I explained my learning disability to him. I asked him to accommodate my disability by providing me with his lecture notes and to ask my other two professors to give me their lecture notes. He refused to give me his notes and refused to direct my other professors to do so. I also asked him to reduce my course load for the doctoral program. He refused.

24. During our January 11, 2019 meeting, Lawrence responded to my requests for accommodation by telling me that if my disability was going to pose a problem for me keeping up with the program, I might have to make a difficult decision on whether this degree and career path were right for me. Lawrence did not acknowledge that the doctoral program had any obligation to provide effective accommodations for my disability.

25. At the beginning of the spring semester 2019, I asked Professor Jiang for his lecture notes to accommodate my disability. He kept the notes in a Word file and sometimes projected them for students to see equations during the class, but he scrolled them too quickly for me to take useable pictures of them. Jiang told me that he would not give me the lecture notes because they contained typos. He gave me no other explanation for his failure to honor my request for his notes. However, Jiang gave his notes to another student about a week before the final exam. That student shared them with me, but I received the notes too late to help me follow lectures or to complete assignments during the semester.

26. Jiang gave me an F because, without receiving effective accommodations for my disability, I could not perform satisfactorily in his class. When I took the class again in 2020-21 with my requested accommodations, I received a B.

27. None of the professors in the spring semester 2019 gave me their lecture notes in advance of lectures so that I could follow the lecture by reading their notes. I could see that all of the professors were lecturing from notes. Dr. Kang handed out some written solutions to assignments after his students completed the assignments and the professor I knew as Dr. G. provided two or three short handouts, but those documents were not an effective substitute for lecture notes.

28. Because I did not have lecture notes, I spent an extraordinary amount of time trying to process recorded lectures and prepare written notes that I could use to study for exams and complete assignments. I fell behind in my assignments because it was overwhelming for me to take three classes per semester, given the volume of spoken information I needed to process.

29. Some professors in the 2018-19 academic year gave me additional time to complete assignments. However, Professors Jiang and Lawrence penalized me for turning in assignments late.

30. Lawrence told me repeatedly during the spring semester of 2019 that he would not give me any accommodations that had not been mandated by DRC. I was therefore caught between DRC, which told me the professors and/or the department needed to authorize my requested accommodations, and Professor Lawrence, who told me that he would not provide any accommodations unless they came from DRC.

31. On several occasions during the spring 2019 semester, I politely advised Loynaz and Lawrence (and later Professor Hamid) that I objected to their failure to provide effective accommodations of my disability. My objections produced no results until after my 2018-19 courses were over.

32. I therefore participated in the spring 2019 semester without important accommodations that I had requested for my disability. The spring semester was more challenging for me than the previous semester because exams were primarily based on lectures rather than textbooks or handouts. I received poor grades in my spring semester classes because, without effective accommodations, I could not process lectures in all three courses quickly enough to create the written notes I needed to study for exams and to complete assignments.

33. I know from my experience in academic year 2020-21, after I restarted the program with full accommodations, that a reduced course load and receiving lecture notes were necessary and effective means of allowing me to participate equally with nondisabled students in the doctoral program. I was not provided with those accommodations during the 2018-19 academic year. When I restarted the program in the 2020-21 academic year, DRC required the department to reduce my course load and required my professors to provide lecture notes. I did well in my classes because I was not overwhelmed by the amount of spoken language I was required to process during my classes.

34. Lawrence was aware from our discussions that if my disability was not accommodated, I would not be able to process his spoken lectures, or to prepare written solutions to problems quickly. On January 30, 2019, less than a month after I first explained the nature of my disability and requested accommodations from him, Lawrence humiliated me in his class. He asked students to write down solutions to problems during the class. He repeatedly looked over my shoulder and berated me, in front of my classmates, for failing to write down answers to problems that my disability prevented me from solving quickly.

35. I met with Lawrence again on March 8, 2019 to discuss accommodations of my disability. Lawrence told me he would not share his lecture notes with me because that would be unfair to other students. He did not explain why it is unfair to nondisabled students to accommodate a disabled student. Nor did he offer any other explanation for his failure to share his lecture notes.

36. Regardless of any concerns Lawrence allegedly had about giving me his lecture notes in 2019, he provided them after I restarted the program and took his course again in 2021. At that point, DRC had instructed Lawrence to provide me with his lecture notes.

37. During the March 8, 2019 meeting, I explained that because my disability had not been accommodated effectively, I was behind in every class. Lawrence then informed me that he and Jiang had discussed my performance and they both agreed that Jiang should fail me because they had "an obligation to protect the profession." The context of the conversation made clear that Lawrence was speaking of the academic profession. In a later meeting, Lawrence suggested to me that I might want to pursue a career in practical finance rather than a more rigorous academic career because of the difficulties posed by my disability. Rather than accommodating my disability, Lawrence thought I should stop pursuing an academic career.

38. During the March 8, 2019 meeting, Lawrence mentioned that I never disclosed my disability on my application for the doctoral program. He also told me that "knowing what I know now, I would not admit a student with a disability in the future because the program is too rigorous."

39. When I explained to Lawrence on March 8, 2019 that my struggles in the program were caused by the failure provide me with instructors' notes and to reduce my course load, Lawrence insisted that that the doctoral program was strictly a 4-year cohort program and that I had to keep pace with my classmates. He told me that no adjustments to the program structure could be made and no accommodations would be provided only to me because that would be unfair to my classmates. He did not explain why it is unfair to give accommodations to disabled students who need them but not to nondisabled students who don't need them.

8

40. Despite Lawrence's insistence that no adjustments to the program structure could be made, when DRC directed Lawrence and the department to reduce my course load during the 2020-21 academic year, they did so.

41. I complained to Loynaz about the above-described comments that Lawrence made to me in January and March 2019 shortly after he made them. I reported the comments to Loynaz because I viewed them as discriminatory. Although I put DRC on notice of Lawrence's discriminatory attitude toward students with learning disabilities, DRC took no action to protect me from discrimination in the spring semester of 2019.

42. Prior to his midterm exam in the spring semester of 2019, Lawrence provided the correct solutions to homework assignments to the other students in my class so that they could use them to prepare for the midterm exam. Although I submitted my homework assignments before the midterm exam, Lawrence did not provide me with the solutions to those assignments. He therefore treated me less favorably than the non-disabled students in the class. Not having the solutions disadvantaged me as I attempted to prepare for the midterm. I could not complete the exam because I was not furnished with the same study materials that nondisabled students received. I was also unable to complete the midterm exam because, in the absence of the accommodations I requested, my classwork was overwhelming and I had fallen behind. I became despondent when I realized that I could not solve the test problems and so I did not try to complete the exam.

43. Lawrence allowed everyone in the class, regardless of disability, to retake the midterm as a makeup exam. This was not an accommodation of my disability. I took the makeup exam after having a chance to study over the spring break. I was able to spend time I did not have prior to the first exam making written notes from recorded lectures. I scored 21 of 22 points on the makeup exam and would have earned a score of 95%, but Lawrence penalized me for failing to complete the first midterm and gave me a score of 59%.

44. A few days after my March 8, 2019 meeting with Lawrence, I worked together with a nondisabled student on two homework assignments in Lawrence's FIN 7809 class. Lawrence encouraged students to work together and he was aware that the nondisabled student was tutoring me. The assignments required students to replicate mathematical proofs. Because there is little to no variation in their possible solutions, all correct solutions will be similar to each other. It did not occur to me that working together

9

to arrive at the only correct solution constituted plagiarism. When Prof. Lawrence determined that the nondisabled student and I were both guilty of plagiarism for working together to arrive at the same solution, he gave me a lower grade than he gave the nondisabled student as punishment for committing the same offense of plagiarism. The punishment had a negative impact on the grade I received for the course.

45. I filed an academic grievance with FIU's Graduate Student Academic Grievance Committee based on the harsher punishment that Lawrence imposed on me than he imposed on the nondisabled student. The Committee found that Lawrence's unequal punishment was arbitrary and capricious.

46. I registered for Professor Lawrence's Finance Doctoral Independent Study course (FIN 7906) in the summer of 2019. FIU's course description stated that the course would consist of "Supervised research projects determined by professor and student." In violation of FIU policy 300.010, Lawrence did not prepare a syllabus for the course. I therefore did not know what was expected of me. I waited for Lawrence to contact me to determine the supervised research project that I should pursue. Although Lawrence met with the other students who took the class (all of whom were nondisabled), he did not meet with me. Because I did not complete an independent study project, Lawrence gave me a grade of incomplete. He told me that the grade would be converted to an F. After I restarted the program with my requested accommodations, I completed the course under the supervision of a different professor and was awarded a grade of A-.

47. It was clear to me that the cumulative grades I would receive in academic year 2018-19 were below the standard required to continue in the program. I elected not to take a qualifying exam that is necessary to move on to the second year of the program because it would have been pointless. I asked Professors Lawrence and Hamid whether I could continue in the program if I passed the qualifying exam and they told me no. The grades I received already excluded me from participation in the second year.

48. I met with Professors Lawrence and Hamid on or about June 19, 2019 to discuss my future in the doctoral program. I advised them that my disability had not been effectively accommodated and that my inability to complete the program was caused by FIU's failure to accommodate my disability. I asked their advice in finding a solution to the problem that FIU had caused.

49. Lawrence and Hamid suggested that I should pursue a Doctor of Business Administration rather than a Ph.D. because it is less a less rigorous degree that is intended for practitioners in business and finance rather than students who want to pursue an academic career. I rejected that suggestion because a DBA would not allow me to pursue my career goals. I was willing to pursue a rigorous program but wanted the accommodations that the law requires so that I would have the same opportunity that nondisabled students to participate in the program.

50. Lawrence and Hamid told me that professors had gone out of their way to accommodate by giving me extra time to finish assignments. I would not have needed extra time if I had been given the accommodations I needed, including a reduced course load and lecture notes. The department simply failed to provide effective accommodations for my learning disability.

51. Lawrence and Hamid also told me that my disability did not mean I could take a qualifying exam a month or two later, that I had to adhere to the department's time frames, and that I was not entitled to extra time to complete my course work. I told Lawrence and Hamid that I had asked DRC for a reduction in course load and for lecture notes, but DRC told me that the department needed to approve those accommodations. I reminded Lawrence that I had asked the department for those accommodations repeatedly. Lawrence and Hamid told me that DRC did not notify them of any need to provide those accommodations and the department would not do so unless DRC required them to do so.

52. Specifically addressing lecture notes, Lawrence and Hamid told me that professors will not give me their notes unless they are required to do so. They told me that if a class has a textbook, that's a sufficient accommodation. Textbooks, however, do not contain the text of class lectures, and exams in my spring 2019 courses were based on class lectures. Having a textbook was not an effective accommodation of my learning disability.

53. Lawrence and Hamid told me that I cannot have an accommodation just because I request it. They made no attempt to evaluate whether my requests were reasonable and they offered no effective alternative.

54. Lawrence and Hamid also told me that they cannot give me something that they do not give every other student. Their comments made clear that they believed that complying with laws that protect the disabled would be unfair to the nondisabled.

55. Lawrence told me "This is my first experience with a student who can't learn. We must be given things in advance because we don't understand disability." I did, however, request accommodations from DRC and Lawrence before spring 2019 classes even started. DRC told me to ask the professors and the department for accommodations while Lawrence and Hamid told me I needed to get accommodations approved by DRC. I was caught in the middle of their bureaucratic in-fighting.

56. Toward the end of our meeting, Lawrence and Hamid suggested that I might be allowed to take the second semester courses again when they are offered in 2021 and move on with the program at that point.

57. I did eventually reach an agreement to restart the program in academic year 2020-21. I discovered in August 2019, however, that I was no longer enrolled as a graduate student. My credentials to log into FIU databases and to use FIU facilities had been revoked because FIU determined that I was no longer enrolled in the doctoral program. Since FIU effectively terminated my participation in the program, I could no longer work or be paid as a graduate assistant.

58. On August 20, 2019, after FIU was no longer recognizing me as a student enrolled in the doctoral program, DRC finally granted my requested accommodations, including a reduced course load and lecture notes. (Loynaz's accommodation letter refers to "requires notetaker" but the explanation that accompanies the letter states that professors may provide lecture notes to the student in lieu of providing a notetaker.) At that point, it was too late for me to benefit from the accommodations during the 2018-19 academic year. My school year was essentially wasted because I was not given the accommodations I requested in a timely manner.

59. When I restarted the program in 2020-21, I was only required to take two classes for grades. I audited the remaining courses and kept the grades for those classes that I earned in 2018-19. I repeated two courses for grades. I expected that the new grades I earned would be substituted for the grades I earned in 2018-19 when my disability was not being accommodated. In 2020-21, I earned a B in both of those courses because the professors gave me lecture notes and because, having to take only two courses for grades, my course load was reduced. If the B grades I earned in 2020-21 are substituted for the

12

grades I received in 2018-19, my cumulative GPA is above 3.0, making me eligible to continue in the program.

60. I took Lawrence's class in spring 2021. I was earning an A in Lawrence's class until Lawrence suddenly and without explanation used a "bonus point" system to grade my final exam. The change in grading methodology reduced my grade from an A to a B.

61. I viewed Lawrence's change of his grading methodology as retaliatory. I viewed other conduct after my return to the program as retaliatory. I believed the retaliation could continue if I remained in the program. I discussed my concerns with Loynaz but received no protection from further retaliation. I decided that pursuing the doctoral program at FIU was damaging to my mental health, so I decided not to take the qualifying exam. By earning good grades, I nevertheless demonstrated my ability to succeed in the program when my disabilities are accommodated effectively.

62. If I can obtain protection against retaliation, I would like to resume the doctoral program.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Nov 17, 2023.

*Daniel A. Amy*
Daniel A. Amy (Nov 17, 2023 09:52 EST)

Daniel Amy

13

# GRADUATE ASSISTANT EMPLOYMENT AGREEMENT 2021-2022

THIS AGREEMENT is between FLORIDA INTERNATIONAL UNIVERSITY (FIU) and the Graduate Assistant temporary Employee (print EMPLOYEE Name) _____ (Panther ID)_____, and is subject to the following terms and special conditions:  The **EMPLOYEE(RA/TA/GA)** will be employed in one of the following categories checked below. The Employee must be fully admitted to a graduate degree program and be under the supervision of an appropriate faculty member.  Some positions may require special qualifications such as completion of a specified number of graduate credit hours or a master's degree or specialization in an appropriate area of research.  **Please check one category and see below the conditions of employment agreement.**

○ **Graduate Research Assistant - Class Code 9182** A Graduate Research Assistant shall be a degree seeking graduate student who performs research duties related to his or her academic program. The RA will perform general duties related to research, documentation, experimentation, interviews and other activities that support the academic endeavor of the supervising faculty. For some positions assigned to this class, special qualifications may be added to the minimum such as completion of a specified number of graduate credit hours or a master's degree or specialization in an appropriate area of research.

○ **Graduate Teaching Assistant - Class Code 9184** A Graduate Teaching Assistant shall be a degree seeking graduate student who assists a faculty member with a teaching assignment.  The duties may include, but are not limited to, preparing lectures, grading assignments, researching class topics and substituting for Faculty of Record on select class days. A Graduate Teaching Assistant who is the Instructor of Record must have completed 18 graduate credit hours in the subject area and perform teaching duties related to his or her academic program.The evaluation of teaching for all adjunct faculty and graduate teaching assistants serving as primary instructors will be conducted in accordance with the FIU *Adjunct Faculty and Graduate Teaching Assistant Policy #380.079*

○ **Graduate Assistant - Class Code 9185** Graduate Assistants shall be degree seeking graduate students who assist in the teaching and/or research function, but do not have primary responsibility for teaching and/or research. The duties may include those outlined in either the teaching or research classifications as well as other duties assigned that relate to his or her academic program. Graduate Assistant should be used only when neither GTA nor GRA is appropriate.

**CONDITIONS OF EMPLOYMENT AGREEMENT:**

- EMPLOYEE agrees NOT to accept employment outside of FIU.
- EMPLOYEE must NOT accept an appointment which individually or collectively exceeds 0.50 FTE **(20 hours per week)** without **prior** petition approval by the Dean of the University Graduate School.
- Appointment is contingent upon <u>full-time</u> enrollment (9 graduate credits in Fall and Spring; 6 graduate credits in Summer) and satisfactory academic and work performance (GPA of 3.0 or higher).
- Doctoral students who will be candidates in the Fall (with D2 or D2/D3, depending on program requirements, approved before the Fall term) must register for 3 dissertation credits only. The tuition waiver will only cover the 3 credits unless they are in their last graduating semester and need more than the 3 credits to meet the program's requirements.
- Employment is terminated at the end of session. No further notice of cessation of employment is required. Employment may be terminated at any time if performance is unsatisfactory.

**Insurance Coverage –** An EMPLOYEE holding an appointment of **20 hours per week** for the full term will be automatically enrolled in the University's subsidized health insurance program.  The employee portion (25%) of the total premium will be deducted from his/her paycheck as detailed in the chart below.

| Length of GA Contract | Fall Premium | | Spring Premium | | Summer Premium | | Coverage Period |
|---|---|---|---|---|---|---|---|
| | Total | 6 Paycheck Deductions | Total | 6 Paycheck Deductions | Total | 6 Paycheck Deductions | |
| Full Academic Year | $196.00 | $32.66 | $204.25 | $34.04 | $191.50 | $31.92 | Annual contract dates |
| Fall only | $196.00 | $32.66 | - | - | - | - | Fall contract dates |
| Spring only | - | - | $204.25 | $34.04 | - | - | Spring contract dates |
| Summer only | - | - | - | - | $191.50 | $31.92 | Summer contract dates |

**By signing this Employment Agreement**, the EMPLOYEE <u>approves</u> the payroll deductions described above. To opt out of this health plan and avoid these deductions, the EMPLOYEE must log in to www.gallagherstudent.com/FIU and submit the information required. The deadline is Friday, September 17, 2021.

**Tuition Waiver -** An EMPLOYEE holding an appointment of 20 hours per week (0.5 FTE) for the <u>full</u> term will have the tuition matriculation fee paid by the University as part of this employment agreement. The Employee is still responsible, however, for the per credit fees of $75.69 along with the standard semester fees (detailed on the GA summary chart). Laboratory, on-line, and other special fees must be added to this total. Below is an example for a typical semester.

```
            9 credit hours at $75.69 per credit fees   $681.21
            Semester Fees-health, athletic&parking    $198.82
            Total Cost per Term                       $880.03
```

* Add Photo ID $10 (applicable to all students during Fall term) **Add a $35 orientation fee for new students enrolling for the first term.

**CANCELLATIONS-**EMPLOYEES whose contracts are canceled within an active semester will have their tuition waiver benefits reversed. Any resulting tuition charges will be the responsibility of the EMPLOYEE.

_____     _____
Employee Signature                    Date      Division/Department Head                  Date

_____     _____
Employee Panther ID                             Grant Principal Investigator (if applicable)   Date

**Deadline to submit this form is Friday, September 3, 2021**                    EXHIBIT 1